IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| XANITOS, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 3:23-cv-2339-DWD |
| | ) |
| AMERICAN HEALTHCARE SYSTEMS ILLINOIS, LLC, | ) ) ) |
| | ) |
| Defendant. | ) |

### MEMORANDUM & ORDER

**DUGAN, District Judge:**

Before the Court is Plaintiff's Motion to Enforce Settlement. (Doc. 58). Defendant filed a Response in Opposition, and Plaintiff filed a Reply in Support, of that Motion. (Docs. 62 & 63). As explained below, Plaintiff's Motion to Enforce Settlement is **DENIED**.

### I. BACKGROUND

On April 14, 2015, Plaintiff and CHSPSC, LLC, entered a Master Service Agreement for Plaintiff "to provide environmental services, linen distribution, and patient transportation services" to the latter entity's hospitals. (Doc. 1, pg. 2). Thereafter, CHSPSC, LLC, announced a plan to create a new publicly traded hospital company, Quorum Healthcare Corporation. (Doc. 1, pg. 2). CHSPSC, LLC, was purportedly successful in that endeavor, as Plaintiff entered a Master Service Agreement for the same services with Quorum Healthcare Corporation on February 25, 2016. (Doc. 1, pg. 2).

On February 1, 2022, a Statement of Work, which was governed by the 2016 Master Service Agreement, was executed for Granite City Illinois Hospital Company, LLC,

d/b/a Gateway Regional Medical Center. (Doc. 1, pg. 3). On March 1, 2023, Defendant purchased Quorum Healthcare Corporation. (Doc. 1, pg. 4). Those parties entered an Assignment and Assumption agreement on that same date. (Doc. 1, pg. 4). As part of the purchase, Defendant acquired Gateway Regional Medical Center. (Doc. 1, pg. 4). In addition, Defendant replaced Quorum Healthcare Corporation as a party to the 2016 Master Service Agreement and the 2022 Statement of Work. (Doc. 1, pg. 4).

After March 10, 2023, Defendant allegedly fell out of compliance with its assumed obligations. (Doc. 1, pg. 4). Plaintiff sent Defendant at least two Slow Payment Notification Letters but, aside from a single $30,000 payment, Defendant did not cure the breach or become current on the outstanding payments. (Doc. 1, pg. 5). As of June 30, 2023, Defendant allegedly owed $568,438.29, plus $17,816.20 in interest but minus $27,884.60 for a Labor Reconciliation Credit, for services rendered by Plaintiff under the 2022 Statement of Work. (Doc. 1, pg. 5). As of July 5, 2023, Defendant still made no efforts to become current on the past due invoices. (Doc. 1, pg. 5). In total, Plaintiff alleges "$1,025,427.13 remains outstanding and is rightly owed and collectable from Defendant." (Doc. 1, pg. 6). That total accounts for $568,438.29 in past due balances, $17,816.20 in interest, and $497,057.23 in an early termination penalty, minus the $30,000 payment and the $27,884.60 Labor Reconciliation Credit. (Doc. 1, pg. 6). Plaintiff filed a Complaint, alleging a breach of the 2016 Master Service Agreement (Count I) and unjust enrichment for the failure to pay for services rendered by Plaintiff (Count II). (Doc. 1, pgs. 6-8).

On November 14, 2023, a Report of Mandatory Mediation indicated the case did not settle under the Court's Mandatory Mediation Plan. (Doc. 37); Admin. Order No. 301

(eff. Oct. 8, 2021). Further, between February 20 and August 28, 2024, the case was stayed in order for the parties to comply with the mandatory mediation and arbitration provision of the Master Service Agreement. (Docs. 38 & 48). The case did not settle under that provision. (Doc. 48). Therefore, the Court lifted the stay of the case and, eventually, entered an Amended Scheduling and Discovery Order. (Docs. 48, 52, 53).

Thereafter, Plaintiff filed its Motion to Enforce Settlement, which indicated, on December 9, 2024, the parties entered a settlement agreement that was subsequently breached by Defendant. (Doc. 58). Defendant, for its part, disputes the parties arrived at a settlement. (Doc. 62). In any event, after reviewing the parties' filings, the Court opined that the case could benefit from a settlement conference with a magistrate judge before it resolved the Motion to Enforce Settlement. (Doc. 64). The parties did not object. (Doc. 64). Accordingly, the parties were directed to a Settlement Conference with Magistrate Judge Gilbert C. Sison. (Docs. 64 & 65). The Court was later informed that the Settlement Conference, which was held on June 20, 2025, failed to resolve this action. (Doc. 68).

Based on this record, the Court resolves Plaintiff's Motion to Enforce Settlement.

## II. ANALYSIS

In its Motion to Enforce Settlement, Plaintiff argues the parties entered a Settlement Agreement on December 9, 2024, whereby Defendant would pay Plaintiff $650,000 as follows: $450,000 by December 31, 2024; $50,000 by January 31, 2025; $50,000 by February 28, 2025; $50,000 by March 31, 2025; and $50,000 by April 30, 2025. (Docs. 58, pg. 1; 58-2, pg. 3). As support, Plaintiff attaches the parties' attorneys' emails to its Motion to Enforce Settlement. (Doc. 58-1). On December 9, 2024, Plaintiff's attorney emailed:

3

> My client accepts your client's proposal of the following:
> 650k total
> 450k by end of month
> End of January 50 k
> End of February 50k
> End of March 50k
> End of April 50k
>
> I will put together a release to send you guys shortly.

(Doc. 58-1, pg. 1).

That same day, in response to Plaintiff's attorney's email, Defendant's attorney stated: "Great news! Thank you both for your work to get this done." (Doc. 58-1, pg. 1). On December 23, 2024, which was two weeks after the above email exchange, Plaintiff's attorney emailed Defendant's attorney the following message with an attached proposed Settlement Agreement: "See attached proposed release. Let me know if you have any proposed revisions." (Docs. 58, pg. 2; 58-2, pg. 1). The attached proposed Settlement Agreement, which Plaintiff itself did not sign, is contained in the record. (Doc. 58-2).

On December 27, 2024, Plaintiff's attorney, at Defendant's attorney's request, sent instructions for wiring the $450,000 payment that was due by December 31, 2024, "so [he] c[ould] get the first payment set up." (Docs. 58, pg. 2; 58-3). On January 8, 2025, which was after the date that the first payment was allegedly due, Defendant's attorney emailed Plaintiff's attorneys, stating: "I sent the client a revised (hopefully nothing controversial) version of the release but have not received a response. I will use this prompt for you to tell them that your client is getting antsy and this has to get done." (Doc. 61-1).

Plaintiff now states, "[d]espite entering into the agreement…, Defendant has not made the payment that was due on December 31, 2024, and has not executed the

4

proposed (or any) settlement release." (Doc. 58, pg. 2). Since "there is no dispute that a settlement agreement was entered into or that the material and essential terms were agreed upon," in writing, in the above emails, it seeks for "Defendant to comply with the settlement agreement by executing the settlement release and making the payments in accordance with the settlement agreement outlined in" the emails. (Doc. 58, pg. 3).

In its Response, Defendant argues the parties never arrived at final terms for the Settlement Agreement. (Doc. 62, pg. 1). As is suggested with Plaintiff's arguments, Defendant notes "[n]owhere attached to [Plaintiff's] motion is any agreement signed by [Defendant]." (Doc. 62, pg. 1). For that reason, Defendant notes Plaintiff merely "attaches correspondence among counsel in which [Plaintiff's] attorney says that [Plaintiff] is willing to accept certain payment terms and…will take the first pass at drafting a mutually agreeable release." (Doc. 62, pg. 1). Defendant argues a mutually agreeable release, *i.e.*, a signed Settlement Agreement, was always a condition precedent to the performance of the settlement terms. (Doc. 62, pg. 1). Defendant argues the parties have not yet arrived at mutually agreeable terms. (Doc. 62, pg. 1). Indeed, in Defendant's view, "the terms that [Plaintiff] proposed for the release are so onerous and one-sided that [Defendant] could not possibly agree." (Doc. 62, pg. 1). On this point, Defendant notes:

> For example, pursuant to the terms in Section 3.0, titled "Breach," Xanitos would have been entitled to a consent judgment in the full amount of $804,996.90 even if AHS was just one day late on making the final payment—meaning Xanitos stood to potentially obtain a double recovery of the amount it claims to be owed.

(Doc. 62, pgs. 1-2).

Defendant also notes its ability to make the payments contemplated by Plaintiff's

5

proposed schedule was impaired by the unforeseen fires in Los Angeles, California, where its parent company maintains its headquarters. (Doc. 62, pgs. 1-2). According to Defendant, its "concerns about the[] painfully one-sided proposed terms were proven tragically justified when [those] massive fires…caused logistical and financial difficulties." (Doc. 62, pg. 2). The fires allegedly "cut in half the pool of available capital needed for emergency expenses, leaving [Defendant] in a precarious situation that would have almost certainly resulted in a technical default and potential double-recovery for [Plaintiff] had the release agreement been executed as drafted by [Plaintiff]." (Doc. 62, pg. 2). In short, Defendant takes the following position: "It was never agreed among the parties that [it] would be required to make payments without even knowing the final terms of the release…or whether it could potentially [be] expose[d]…to effectively double-liability for a technical failure to pay on time." (Doc. 62, pg. 2).

The arguments in Plaintiff's Reply can be summarized as follows:

> Defendant now seeks to go back on that settlement agreement by asking this Court to apply contract law principles inconsistent with Illinois law. Defendant erroneously claims that a release is required for a settlement agreement to be enforceable while also claiming it cannot pay on the settlement agreement due to financial hardship. Not only are signed releases not required for a contract to be binding, but Defendant has pointed to no case law in support of its position. Defendant further argues that the release proposed by Plaintiff contains material and onerous terms. However, Illinois courts have held the additional terms proposed by Plaintiff to not be material. Finally, Defendant's financial hardship argument is unsubstantiated by the evidence[, as the Los Angeles fires did not even begin until…over a week after the first payment was due].

(Doc. 63, pgs. 2, 4).

Now, the Court "possesses the inherent or equitable power summarily to enforce

an agreement to settle a case pending before it." *See Wilson v. Wilson*, 46 F.3d 660, 664 (7th Cir. 1995). Questions related to the formation, construction, and enforcement of settlement agreements are governed by state contract law. *Beverly v. Abbott Laboratories*, 817 F.3d 328, 333 (7th Cir. 2016) (citing *Sims–Madison v. Inland Paperboard & Packaging, Inc.*, 379 F.3d 445, 448 (7th Cir. 2004)). Under Illinois law, a settlement agreement is enforceable if there was an offer, acceptance, and meeting of the minds or mutual assent to each material term. *See id.* (citing *Abbott Labs. v. Alpha Therapeutic Corp.*, 164 F.3d 385, 387 (7th Cir.1999)); *Lampe v. O'Toole*, 292 Ill. App. 3d 144, 146 (1997) (citing *McAllister v. Hayes,* 165 Ill. App. 3d 426, 427 (1988); *Sheffield Poly–Glaz, Inc. v. Humboldt Glass Co.*, 42 Ill. App. 3d 865, 868-69 (1976)). When the Court can ascertain what the parties agreed to do, the material terms of a settlement agreement are sufficiently definite and certain. *Beverly*, 817 F.3d at 333 (citing *K4 Enters., Inc. v. Grater, Inc.*, 394 Ill. App. 3d 307, 333 (2009)). As noted by the Seventh Circuit, "Illinois follows the objective theory of intent whereby the written records of the parties' actions—rather than their subjective mental processes— drive the inquiry." *Id.* (citing *Newkirk v. Village of Steger,* 536 F.3d 771, 774 (7th Cir. 2008); *Int'l Minerals & Chem. Corp. v. Liberty Mut. Ins. Co.,* 168 Ill. App. 3d 361, 370 (1988)). A settlement agreement is enforceable, despite the omission of certain terms, if the terms are immaterial. *Id.* at 334-35 (citing *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 564 (7th Cir. 2012); *Pritchett v. Asbestos Claims Mgmt. Corp.,* 332 Ill. App. 3d 890, 897 (2002)).

Unless the parties decide to expressly condition their deal on the signing of a formal document, informal writings can constitute a binding settlement agreement if they manifest each party's intent to be bound by the material terms proposed. *See Abbott*

*Labs.*, 164 F.3d at 388-89; *see also Lampe*, 292 Ill. App. 3d at 146-47 (holding, in the context of an oral settlement agreement, "the lack of a written release does not control [enforceability] unless the parties intended to make a release a condition precedent to the agreement"); *Desimone v. Danaher Corp.*, No. 17-cv-5232, 2018 WL 4181483, *6 (N.D. Ill. Aug. 31, 2018) (stating, outside of the oral contract context, "[a] party's signature to a contract may be a condition precedent, but it need not be: 'whether the signing of the instrument is a condition precedent to its becoming a binding contract…usually depends upon the intention of the parties.' "); *Woods v. Wickes Furniture, Inc.*, No. 9-cv-300, 2011 WL 1337089, *3 (N.D. Ill. April 7, 2011) ("Although a contract can be formed before there is an official document memorializing the deal, if the parties understand that the execution of a formal document shall be a prerequisite to their being bound there is no contract until the document is executed. In other words, where the reduction of an agreement to writing and its formal execution is objectively intended by the parties as a condition precedent to its completion, there can be no contract until then, even if the actual terms have been agreed upon.") (cleaned up). The following factors are persuasive in determining whether the parties intended, as a condition precedent, for their agreement to be reduced to writing: whether the contract is one that is usually put into writing; whether there are a few or a great many details; whether the amount of money at issue is small or large; whether the agreement requires a formal writing for the full expression of the covenants; and whether the negotiations indicate a written document was contemplated by the parties to conclude the negotiations. *See Ceres Illinois, Inc. v. Illinois Scrap Processing, Inc.*, 114 Ill. 2d 133, 144 (1986) (citing *W.T. Grant Co. v. Jaeger*, 224

Ill. App. 538, 546 (1922)); *accord David Copperfield's Disappearing, Inc. v. Haddon Advert. Agency, Inc.*, 897 F.2d 288, 292 (7th Cir. 1990); *see also Chicago Inv. Corp. v. Dolins*, 107 Ill. 2d 120, 124 (1985) (applying these factors outside of the oral contract context). When the contemplated document is never executed, the parties' conduct and statements after the alleged agreement may be decisive in determining whether they actually made a contract. *See Ceres Illinois, Inc.*, 114 Ill. 2d at 144 (citing *Knightsbridge Realty Partners, LTD–75 v. Pace*, 101 Ill. App. 3d 49, 52 (1981)); *accord David Copperfield's Disappearing, Inc.*, 897 F.2d at 292.

Here, Defendant's offer to settle is not contained in the record. However, as noted above, Plaintiff's attorney indicated "[m]y client accepts your client's proposal" of a total payment and payment schedule, and Defendant's attorney replied "Great news! Thank you both for your work to get this done." (Doc. 58-1, pg. 1). Based on this exchange, the record appears to confirm Defendant's purported offer and Plaintiff's acceptance of its proposal. *See Beverly*, 817 F.3d at 333; *Lampe*, 292 Ill. App. 3d at 146; (Doc. 58-1, pg. 1).

Nevertheless, based on the same email exchanges of the parties' attorneys, as well as the proposed Settlement Agreement drafted by Plaintiff's attorney, the Court finds the parties objectively understood and intended for the execution of a formal written document to be a condition precedent for the completion and enforceability of their settlement agreement. *See Abbott Labs.*, 164 F.3d at 388-89; *Lampe*, 292 Ill. App. 3d at 146-47; *Desimone*, 2018 WL 4181483 at *6; *Woods*, 2011 WL 1337089 at *3. When accepting Defendant's purported offer, it was Plaintiff's attorney that represented: "I will put together a release to send you guys shortly." (Doc. 58-1, pg. 1). And, critically, the proposed Settlement Agreement, which was drafted by Plaintiff's attorney, contains the

9

following "Complete Agreement," "Construction," and "Authority" provisions:

> 4.2 *This Agreement contains the entire agreement between the Parties* with regard to the subject matter of this Agreement and shall be binding upon and inure to the benefit of the Parties hereto, jointly and severally, and the executors, administrators, personal representatives, heirs and successors of each, and if required, including without limitation, any successor guardian or conservator of a person or an estate. The terms of his [*sic*] Agreement may not be modified, amended, altered, or supplemented except by the mutual written agreement of the Parties.
>
> 4.3 *The terms of this Release have been negotiated by counsel for the Parties* and the language in this Release shall not be construed in favor of or against anyone.
>
> 4.4 The Parties represent and warrant that they and/or those signing on behalf of a Party have *the full right, power, and authority to enter into and deliver this Agreement* and that *each individual signing this Agreement* on behalf of the Party is fully authorized to do so. Each Party hereby covenants and represents that *it has taken all necessary corporate and internal actions to duly approve the making and performance of this Agreement* and no further corporate or other internal approval is necessary.

(Doc. 58-2, pg. 4) (Emphasis added).

Obviously, the proposed Settlement Agreement was never signed by the parties; however, the above-quoted provisions, which were drafted by Plaintiff's attorney, reflect an understanding and intention for all of "the terms" of the settlement to be "negotiated" and formalized through the execution of a "complete" Settlement Agreement. *See Ceres Illinois, Inc.*, 114 Ill. 2d at 144; *David Copperfield's Disappearing, Inc.*, 897 F.2d at 292. It is likely for that reason, when providing the "attached proposed release," without her client's signature, for Defendant's attorney's review, Plaintiff's attorney advised Defendant's attorney to "[l]et me know if you have any proposed revisions," and

10

Defendant's attorney subsequently "sent [his] client a revised (hopefully nothing controversial) version of the release." (Docs. 58-2, pg. 1; 61-1). Defendant's attorney also indicated he would convey that "this has to get done." (Doc. 61-1). Despite drafting the "Complete Agreement" provision, Plaintiff now seeks to enforce the proposed Settlement Agreement based only on the parties' attorney's emails. (Doc. 58, pg. 3). Similarly, as to the "Construction" and "Authority" provisions, the record does not reflect, in any way, the "terms" of the proposed Settlement Agreement, other than those related to the total payment and payment schedule, were fully and finally "negotiated by counsel for the Parties." (Doc. 58-2, pg. 4). Yet, as noted by Defendant, the proposed Settlement Agreement contains various other substantive provisions—*e.g.*, the "Breach" and "Payment Terms" in §§ 2.2, 2.5, 3.1, 3.2, 3.3, and 3.4—that the record does not reflect were the subject of negotiation and agreement by the parties.[1] (Doc. 62, pgs. 1-2).

---

[1] These provisions of the proposed Settlement Agreement provide as follows:

2.0    Payment Terms.

…

2.2    The Parties agree that if the payment outlined in section 2.1 is not made by close of business on December 31, 2024, then this agreement is null and void and the Parties agree that Xanitos may seek to collect a judgment in the amount of $804,996.90, the full amount owed pursuant to the Opinion of Arbitrator dated August 6, 2024, plus interest.

…

2.5    The Parties agree that if the payments outlined in section 2.3 are not made according to their respective deadlines, then this agreement is null and void and the Parties agree that Xanitos may seek to collect a judgment in the amount of $804,996.90, the full amount owed pursuant to the Opinion of Arbitrator dated August 6, 2024, plus interest at the rate of 1.5% per month accruing from the August 6, 2024, and attorney's fees and costs incurred in order to enforce a judgment and collect amounts owing to Xanitos.

11

In any event, though, the Court stresses its finding that the factors for determining whether the parties intended, as a condition precedent, for their settlement agreement to be reduced to writing, evince that was the case here. The proposed Settlement Agreement is one that is usually reduced to writing, there were ultimately more than a few details to address, the amount of money at issue was rather large, and, as discussed above, a formal writing was shown to be necessary to fully express the various settlement terms and that formal writing was contemplated by the parties to conclude the negotiations. *See Ceres Illinois, Inc.*, 114 Ill. 2d at 144; *David Copperfield's Disappearing, Inc.*, 897 F.2d at 292; *Chicago Inv. Corp.*, 107 Ill. 2d at 124; *see also In re Estate of Adames*, 2020 IL App (1st) 190573, ¶ 55

---

…

3.0    Breach.

3.1    Termination Upon Breach. The Parties agree that if AHS fails to make any payment on time or notifies Xanitos (constructively or actually) that it expects not to timely make a future payment, this Agreement will be automatically terminated, effective immediately and Xanitos may seek immediate judgment against AHS for the full amount of $804,996.90, the amount owed pursuant to the Opinion of Arbitrator authored by Gayle Malone, dated August 6, 2024, plus interest at the rate of 1.5% per month accruing from the date of August 6, 2024, and attorney's fees and costs incurred in order to enforce a judgment and collect amounts owing to Xanitos.

3.2    Reservation of Right to Judgment. In the event of any breach of this Agreement, Xanitos reserves its right to seek the full amount of any amount it could receive under the Master Service Agreement, including the amount owed pursuant to the Opinion of Arbitrator, dated August 6, 2024, plus interest.

3.3    Waiver of Contest. AHS expressly waives its right to contest any of the terms outlined in the Master Service Agreement in the event of any breach of this Agreement.

3.4    Consent Judgment. In the event of any breach, the Parties agree to a consent judgment in the full amount owed pursuant to the Opinion of Arbitrator, dated August 6, 2024, plus interest at the rate of 1.5% per month accruing from the date August 6, 2024, and attorney's fees and costs incurred.

(Doc. 58-2, pgs. 3-4) (Emphasis in original omitted).

(finding the record was "replete with facts, in addition to the document itself, that indicate[d] that the signature and approval of all parties…served as a condition precedent" to the formation and enforcement of a contract, including that "the final draft of the settlement documents was circulated to the parties…for approval and signature," "counsel for the parties consistently followed up with e-mails…to ensure whether the parties approved and signed the documents," and the attorneys "worked to address any questions"); *Woods*, 2011 WL 1337089 at *4 (denying the defendants' motion to enforce settlement, based on the objective manifestations of the parties' intent for a final executed document, where, *inter alia*, "settlement agreements which include 'releases, covenants not to sue, transfers of rights, and specific provisions as to communications about the settlement and confidentiality' are not typically resolved orally," and "[t]he fact that the contract went through several rounds of back-and-forth revisions further undermine[d] the…assertion that a binding agreement had been reached independent of the document's execution"); *Lampe*, 292 Ill. App. 3d at 147 (finding the parties did not intend for the execution of a written release to be a condition precedent to their settlement agreement, where, unlike in this case, "[n]othing in the limited record on appeal suggest[ed] that, during their negotiations, either party specified that the agreement hinged on the execution of a written release," a "stipulation strongly suggest[ed] otherwise," and "[t]he form release…d[id] not materially alter the settlement" but "merely embodie[d] the agreement the parties had already reached"). For the above-stated reasons, Plaintiff's Motion to Enforce Settlement is **DENIED**.

Nevertheless, an observation is worthy of note here. It would not be an

exaggeration to suggest that each day in this Country thousands of contractual disputes are settled with principal terms of payment identified and agreed upon in an email between representatives of litigating parties that leaves open for future good faith negotiations the terms of release of liability. It is apparent that, for whatever reason, the parties could not come to agreement on the terms of the release portion of the settlement agreement, resulting in further delay. Accordingly, the Court will be setting this matter for status conference by separate order. The purpose of this hearing will be to select a date to begin trial in the 2025 calendar year. Once selected, the matter will proceed to trial unless the parties reach an agreement in written form including all terms of settlement presented to the Court no less than one week prior to the scheduled trial date.

### III.  CONCLUSION

Plaintiff's Motion to Enforce Settlement is **DENIED**.

**SO ORDERED.**

Dated: August 13, 2025

*s/ David W. Dugan*
DAVID W. DUGAN
United States District Judge